**PROVIDENCE JOURNAL COMPANY,**
Plaintiff, Appellee,

v.

**FEDERAL BUREAU OF INVESTIGA-
TION et al., Defendants, Appellants.**

**Raymond L. S. Patriarca,
Defendant-In-Intervention-Appellant.**

**Nos. 79–1056, 79–1067.**

United States Court of Appeals,
First Circuit.

Argued May 7, 1979.

Decided July 27, 1979.

---

William M. Kunstler, New York City, and Harris L. Berson, Providence, R. I., with whom Paul J. DiMaio, Providence, R. I., was on brief, for intervenor-appellant.

Michael Jay Singer, Atty., Civ. Div., Appellate Staff, Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., Paul F. Murray, U. S. Atty., Providence, R. I., Leonard Schaitman and Vincent M. Garvey, Attys., Civ. Div., Appellate Staff, Dept. of Justice, Washington, D. C., were on brief, for federal appellants.

Matthew F. Medeiros, Providence, R. I., with whom Joseph V. Cavanagh, Jr., Providence, R. I., was on brief, for appellee.

---

* Of the District of Massachusetts, sitting by designation.

1. Appellee has not appealed this conclusion, and we need not address it. Exemption 3 states that the FOIA "does not apply to matters that are . . . specifically exempted from disclosure by statute . . ., provided that

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, MURRAY, Senior District Judge.*

COFFIN, Chief Judge.

Between March of 1962 and July of 1965 defendant-appellant, the Federal Bureau of Investigation (FBI), conducted electronic surveillance of Raymond Patriarca's business office. The surveillance violated the Fourth Amendment. FBI agents recorded conversations, and compiled logs and memoranda from the tapes before erasing them. The resulting 2000 documents, consisting of over 7000 pages of summaries of the conversations, are the subject of this litigation.

In November, 1976, plaintiff-appellee, the Providence Journal Co., wrote to the Attorney General asking for release of the documents under the Freedom of Information Act (FOIA). In June, 1977, the director of the FBI denied the request in its entirety, relying on three subsections of Exemption 7 of the FOIA. 5 U.S.C. § 552(b)(7)(A), (C), and (D). The Journal's appeal to the Justice Department went unanswered for over 20 days, and in August of 1977, the Journal exercised its right to consider its administrative remedies exhausted and to file this action in the district of Rhode Island. 5 U.S.C. § 552(a)(6)(A)(ii) and (C). Subsequently the Attorney General affirmed the FBI's decision, but relied on only Exemption 7(C).

The district court issued a preliminary decision in which, *inter alia*, it granted Patriarca's motion to intervene; and ruled that Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), 18 U.S.C. §§ 2510–2520, is a specific statutory exemption under Exemption 3 of the FOIA, 5 U.S.C. § 552(b)(3);[1] but decided that Title

such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3).

III is inapplicable because it has no retroactive effect.[2] 460 F.Supp. 762 (D.R.I.1978).

In its final decision the court divided the requested information into three categories:

"1) Matters relating to Mr. Patriarca's private life, and the private lives of his family members who are still living, *i. e.* his health, as well as that of his family, personal and religious beliefs and the like.

"2) Dealings with public officials and public figures in matters which may be legal and/or illegal.

"3) The names and code names or numbers of FBI agents and informants." 460 F.Supp. 778, 789 (D.R.I.1978).

Applying Exemption 7(C), the court balanced privacy interests against the public interest in disclosure. It held that categories (1) and (3)[3] were protected, but that category (2) was not. The district court refused to stay its judgment pending appeal, but we granted intervenor's motion for a stay in order to maintain the status quo. 595 F.2d 889 (1st Cir. 1979).

We begin our analysis with Title III, Congress' treatment of the problems created by electronic surveillance. We do so because of what we deem to be its compelling significance, not as a statutory exemption under Exemption 3, but in affecting the balancing process to determine whether, under Exemption 7(C), production of records would constitute an "unwarranted invasion of personal privacy". 5 U.S.C. § 552(b)(7)(C).

Title III "has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." S.Rep. 1097, 90th Cong., 2nd Sess., 1968 U.S.Code Cong. & Admin.News pp. 2112, 2153. Congress, concerned about the "tremendous scientific and technological developments" which "seriously jeopardized" the "privacy of communication" to the point where "[e]very spoken word . . . can be intercepted . . . and turned against the speaker", *id.* at 2154, created a "comprehensive scheme" intended "strictly to limit the employment of those techniques." *Gelbard v. United States,* 408 U.S. 41, 47, 92 S.Ct. 2357, 2361, 33 L.Ed.2d 179 (1972). "[T]he protection of privacy was an overriding congressional concern." *Id.* at 48, 92 S.Ct. at 2361. "The Act represents a comprehensive attempt by Congress to promote more effective control of crime while protecting the privacy of individual thought and expression." *United States v. United States District Court,* 407 U.S. 297, 302, 92 S.Ct. 2125, 2129, 32 L.Ed.2d 752 (1972).[4]

The cornerstones of this comprehensive scheme are strict regulation of the use of electronic surveillance and strict regulation of the use to which information gathered through electronic surveillance may be put. Manufacture and possession of the necessary devices are controlled. 18 U.S.C. §§ 2512, 2513. Mandatory procedures are established for procuring authorization to conduct electronic surveillance. 18 U.S.C. §§ 2512, 2513. Limits are placed on the use to which intercepted information, even if legally obtained, may be put. 18 U.S.C.

---

**2.** Our analysis spares us the task of deciding the retroactivity issue. We note, though, that the case on which the district court relied, *United States v. American Radiator & Standard Sanitary Corp.,* 288 F.Supp. 701, 707 (W.D.Pa. 1968), and other cases in accord, *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 291 F.Supp. 247, 250 (E.D.Pa.1968); *People v. Daria,* 38 A.D.2d 833, 329 N.Y.S.2d 647, 648 (1972), are different from this case in that the issue was whether to suppress information in a criminal proceeding, and the surveillance was legal before Title III.

**3.** The district court qualified its holding as to category (3) by saying that appellee could re-

new its request for such information at a later time and by saying that persons now deceased have no protectible privacy interest. We need not address these issues.

**4.** The Senate was aware of the Patriarca surveillance, and at least one Senator urged passage of Title III out of frustration that the surveillance could not be used against Patriarca in court. He contended that "with a proper showing of probable cause and close judicial supervision" surveillance could help convict Patriarca. 114 Cong.Rec. 12986 (1968) (remarks of Sen. Tydings).

§§ 2515, 2517. Congress must be informed of all use of electronic surveillance. 18 U.S.C. § 2519. Finally, Congress has set out criminal and civil penalties for violation of Title III. 18 U.S.C. §§ 2511(1), 2520.

Though Congress clearly sought to deter unwarranted invasions by denying the perpetrators the fruits of illegal surveillance, it did not stop at the limits of the exclusionary rule. Instead, it made Title III remedial. It forbade any disclosure of illegally intercepted information, made such disclosure criminal, and gave the victim of any illegal interception a civil cause of action without regard to the nature of the information intercepted, the occurrence of disclosure, or the sustaining of actual damages. Congress' recognition of the victim's privacy as an end in itself, *Application of the United States*, 413 F.Supp. 1321, 1332 (E.D.Pa.1976), recognizes that the invasion of privacy is not over when the interception occurs, but is compounded by disclosure. *See Gelbard v. United States, supra*, 408 U.S. at 51–52, 92 S.Ct. 2357. Thus "production of such records", to use 7(C)'s language, is another offense to the victim, and is barred. Congress has, in the clearest way, thus decided that the privacy interest of a victim of illegal electronic surveillance is too great to permit any disclosure at all.[5]

The focus of the parties and the district court was so exclusively centered, insofar as consideration of Title III was concerned, on whether it could fit within Exemption 3 that Title III lost all significance once retroactivity was decided. The very bifurcation of these proceedings may have contributed to this restricted focus, since Title III had been shunted off stage before analysis under Exemption 7(C) began. This, we feel, led to error. Though the standard of review normally may be abuse of discretion, under the peculiar circumstances of this case, we think the error was one of law, in according no weight to a deliberate policy

statement of Congress relating to the precise circumstances we face here.

Exemption 7(C) permits an agency to withhold "matters that are . . . investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would . . . constitute an unwarranted invasion of personal privacy". 5 U.S.C. § 552(b)(7)(C). In order to properly balance an individual's right to privacy against the public interest in disclosure, a court must interpret the phrase "unwarranted invasion of personal privacy". Other legislation in which Congress sheds light on the meaning of the phrase should not be ignored. Statutes addressing the same subject should be read consistently. *Kokoszka v. Belford*, 417 U.S. 642, 650, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974). A strict rule confining the relevance of other statutes in FOIA cases to Exemption 3 would work against this basic tenet of statutory interpretation. There is no reason for us to think that what Congress in 1968 considered so unwarranted an invasion of privacy that its fruits should be kept secret would not still be so considered in 1974 when Congress created Exemption 7(C).[6]

In short, Congress, by passing Title III, has already balanced the same kind of factors that must be balanced under Exemption 7(C). Congress had decided that the risk to privacy created by illegal electronic surveillance is too great to permit any disclosure of the fruits of such surveillance. Here the FBI has conceded that the surveillance was "in willful and flagrant violation of the Constitution and applicable Federal Law." The FBI did not get a warrant or consent for the surveillance, and the breadth of the surveillance in terms of time and extent was unreasonable. 460 F.Supp. at 770 & n. 19. This intrusion could not be legal before or after Title III. In fact, this was exactly the kind of "insidious invasion

---

**5.** Title III's policy of nondisclosure has even been held strong enough to overcome the Sixth Amendment's policy of public access to criminal proceedings in certain circumstances. *United States v. Cianfrani*, 573 F.2d 835 (3d Cir. 1978).

**6.** Indeed the same Senator who sponsored 7(C), Senator Hart, opposed Title III because he felt that it could not adequately protect personal privacy. 114 Cong.Rec. 14160–61 (1968).

of privacy" that Congress "singled out for special scrutiny and safeguards." *In re Lochiatto*, 497 F.2d 803, 807 (1st Cir. 1974). Intrusions before 1968 were no less insidious than intrusions after 1968, and to the extent reasonable, the victims should be protected from disclosure after 1968 in accord with Congress' stated policy. We hold that Congress' deliberate balancing under Title III is controlling under Exemption 7(C) given the circumstances of this case.

We recognize that our holding is novel in that, as the district court's survey found, no other court has exempted information under Exemption 7(C) or the closely related Exemption 6 [7] "solely on the ground that the manner in which the information was obtained forbids release", 460 F.Supp. at 786, instead of balancing on the basis of the actual contents of the requested material.[8] One explanation may be that the earliest, formative cases were decided under Exemption 6 because it existed for eight years before Exemption 7(C) was enacted. Although the two exemptions protect the same interest, 120 Cong.Rec. 17033 (1974) (remarks of Sen. Hart), Exemption 6 concerns files which are likely to have been compiled with the knowledge and at least implied consent of the subjects. Secret investigations using controversial investigatory techniques are far more likely in connection with law enforcement activities, the subject of Exemption 7. Moreover, the circumstances of this case are unique and present a particularly compelling argument for considering the manner in which the

information was obtained. Not only has Congress passed a statute addressing this precise problem, but this manner of obtaining information is particularly likely to collect the kinds of information people are entitled to keep private because electronic surveillance is designed to go forward in even the most intimate protected surroundings without the subjects having any knowledge that they are being observed. *See* 1968 U.S.Code Cong. & Admin.News, *supra*, at 2154. The distinction between focussing on the content of information and on the manner of obtaining it blurs when the very manner of obtaining information carries such a likelihood of discovering private facts.

"[D]isclosure, not secrecy, is the dominant objective of the [FOIA]", *Department of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976), and Congress has decried the news media's underuse of the FOIA, *see* 460 F.Supp. at 790. But these concerns must give way to Congress' specific protection of this narrow class of information. Our holding is not broad. It gives agencies no sweeping power to withhold information, and does not create a new, general exemption for illegally obtained information. We are concerned only with the "contents" of "wire" or "oral communications" "intercepted" before June 19, 1968, by means of an "electronic, mechanical, or other device", 18 U.S.C. § 2510(8), (1), (2), (4), and (5), in violation of the Constitution or federal law.[9] Moreover, we need not decide to what extent "ag-

---

**7.** Exemption 6 permits an agency to withhold "matters that are . . . personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy". 5 U.S.C. § 552(b)(6).

**8.** Some courts have gone beyond analysis of the contents of the requested material to consider the effect of a promise of confidentiality to an informant, but that factor has not been determinative. *See* 460 F.Supp. at 786. One court has said that illegality of collection of information does not determine the applicability of Exemption 7(C), but that court was answering an argument that because surveillance of Martin Luther King was illegal the information obtained *should* be released. *Lesar v. De-*

*partment of Justice*, 455 F.Supp. 921, 924 (D.D. C.1978).

**9.** Intervenor suggests that the appropriate narrowing principle is that disclosure should be prohibited when the requested material was obtained by a criminal search, in this case a burglary. Aside from the fact that the record before us does not reveal whether there was a breaking and entering, the Supreme Court has cast doubt on intervenor's argument with *Dalia v. United States*, —— U.S. ——, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979), in which the Court held that covert entries to plant electronic bugging equipment can be legal if the surveillance is legal.

grieved person[s]", 18 U.S.C. § 2510(11), or a criminal prosecutor might have rights different from the third party which brought this suit. We decide only that the FBI may properly turn down this FOIA request under Exemption 7(C).

*Reversed.*