820 F.2d 1342
 91 A.L.R.Fed. 245, 13 Media L. Rep. 1945
 In the Matter of Application to Adjudge the PROVIDENCE
JOURNAL COMPANY and its Executive Editor, Charles
M. Hauser, in Criminal Contempt.
Appeal of PROVIDENCE JOURNAL COMPANY and Charles Hauser.
 No. 86-1336.
 United States Court of Appeals,
First Circuit.
 Argued Sept. 11, 1986.
Decided Dec. 31, 1986.
 
 Floyd Abrams with whom Cahill, Gordon & Reindel, New York City, Edward F. Hindle, William P. Robinson, III, Jeffrey C. Schreck, Edwards & Angell, Joseph V. Cavanagh, Jr. and Blish & Cavanagh, Providence, R.I., were on brief, for appellants.
 Ralph G. Elliot, Tyler, Cooper & Alcorn, Hartford, Conn., on brief, for Hartford Courant and The Concord Monitor, amici curiae.
 James C. Goodale, John G. Koeltl, Arthur H. Amron and Debevoise & Plimpton, New York City, on brief, for CBS Inc., The New York Times Co. and The Washington Post, amici curiae.
 William A. Curran with whom Robert D. Parrillo and Hanson, Curran & Parks, Providence, R.I., were on brief, for appellee.
 Wendy M. Keats and John F. Cordes, Appellate Staff, Civil Div., Dept. of Justice, Richard K. Willard, Asst. Atty. Gen., Washington, D.C., and Lincoln C. Almond, U.S. Atty., Providence, R.I., on brief, for U.S., amicus curiae.
 Before CAMPBELL, Chief Judge, WISDOM,* Senior Circuit Judge, and COFFIN, Circuit Judge.
 WISDOM, Circuit Judge.
 
 
 1
 This appeal presents an apparent conflict between two fundamental legal principles: the hallowed First Amendment principle that the press shall not be subjected to prior restraints; the other, the sine qua non of orderly government, that, until modified or vacated, a court order must be obeyed. The district court adjudged the defendants/appellants, the Providence Journal Company and its executive editor, Charles M. Hauser, (collectively referred to as the "Journal") guilty of criminal contempt. The Journal admits that it violated the order but argues that the order was a prior restraint and that the unconstitutionality of the order is a defense in the contempt proceeding. We agree. A party subject to an order that constitutes a transparently invalid prior restraint on pure speech may challenge the order by violating it.
 
 FACTS
 
 2
 From 1962 to 1965, the Federal Bureau of Investigation conducted electronic surveillance of Raymond L.S. Patriarca, reputedly a prominent figure in organized crime. The FBI conducted this surveillance without a warrant in violation of his Fourth Amendment rights. The FBI later destroyed all tape recordings relating to this surveillance but retained the logs and memoranda compiled from the recordings. In 1976, the Journal requested the logs and memoranda from the FBI under the Freedom of Information Act ("FOIA").[1] The FBI refused this request on the ground that disclosure would be an unwarranted invasion of personal privacy.[2] The Journal then brought suit in the Federal District Court for the District of Rhode Island to compel disclosure.[3] On appeal, we ruled that the FBI was within its discretion when it refused the Journal's request.[4]
 
 
 3
 In the spring of 1985, after the death of Raymond L.S. Patriarca, the Journal renewed its FOIA request to the FBI for the logs and memoranda. The FBI assented to this request and furnished the materials not only to the Journal, but also to WJAR Television Ten and other news media. On November 8, 1985, Raymond J. Patriarca ("Patriarca"), Raymond L.S. Patriarca's son, filed a summons and complaint against the FBI,[5] WJAR, and the Journal.[6] The action was based on the FOIA,[7] Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"),[8] and the Fourth Amendment. The complaint alleged that the FBI had wrongfully released the logs and memoranda to the Journal and WJAR. At the same time Patriarca filed the complaint, he filed a Motion for Temporary Injunctive or Injunctive Relief seeking an order "enjoining the named defendants from disseminating or publishing [the] logs and [memoranda]...."
 
 
 4
 On November 12, 1985, the summons, complaint, and motion were served on the Journal. One day later, the district court held a conference concerning the request for a temporary restraining order. Counsel for the Journal argued that any restraining order would constitute a prior restraint forbidden by the First Amendment. Over the objections of counsel for the Journal and the government, the court entered a temporary restraining order barring publication of the logs and memoranda by the Journal and WJAR. The district court set a hearing for November 15, 1985, at which time it would decide whether to vacate the order. The district court later vacated the order and denied preliminary injunctive relief against the Journal and WJAR.
 
 
 5
 On November 14, 1985, the day after the district court issued the order, and while that order was still in effect, the Journal published an article on the deceased Patriarca that included information taken from the logs and memoranda. The son filed a motion to judge the Journal in contempt. When he declined to prosecute the criminal contempt motion, the district court invoked Fed.R.Crim.P. 42(b) and appointed a special prosecutor. Following a hearing, the district court found the Journal guilty of criminal contempt. 630 F.Supp. 993. Subsequent to a sentencing hearing, the court imposed an 18-month jail term on Hauser, which was suspended, ordered Hauser to perform 200 hours of public service, and fined the Journal $100,000. The Journal appealed.
 
 DISCUSSION
 
 6
 This appeal propounds a question that admits of no easy answer. Each party stands on what each regards as an unassailable legal principle. The special prosecutor relies on the bedrock principle that court orders, even those that are later ruled unconstitutional, must be complied with until amended or vacated.[9] This principle is often referred to as the "collateral bar" rule. The Journal relies on the bedrock principle that prior restraints against speech are prohibited by the First Amendment.[10] In this opinion we endeavor to avoid deciding which principle should take precedence by reaching a result consistent with both principles.
 
 
 7
 Of all the constitutional imperatives protecting a free press under the First Amendment, the most significant is the restriction against prior restraint upon publication. "[T]he chief purpose of [the First Amendment's free press] guaranty [is] to prevent previous restraints upon publication."[11] Indeed, "prior restraints upon speech and publication are the most serious and least tolerable infringement on First Amendment rights".[12] Prohibiting the publication of a news story or an editorial is the essence of censorship. The power to censor is the power to regulate the marketplace of ideas, to impoverish both the quantity and quality of debate, and to restrict the free flow of criticism against the government at all levels. It is plain now as it was to the framers of the Constitution and Bill of Rights that the power of censorship is, in the absence of the strictest constraints, too great to be wielded by any individual or group of individuals.
 
 
 8
 If a publisher is to print a libelous, defamatory, or injurious story, an appropriate remedy, though not always totally effective, lies not in an injunction against that publication but in a damages or criminal action after publication.[13] Although the threat of damages or criminal action may chill speech, a prior restraint "freezes" speech before the audience has the opportunity to hear the message.[14] Additionally, a court asked to issue a prior restraint must judge the challenged speech in the abstract.[15] And, as was true in the instant case, a court may issue a prior restraint in the form of a temporary restraining order or preliminary injunction without a full hearing; a judgment for damages or a criminal sanction may be imposed only after a full hearing with all the attendant procedural protections.[16]
 
 
 9
 Equally well-established is the requirement of any civilized government that a party subject to a court order must abide by its terms or face criminal contempt.[17] Even if the order is later declared improper or unconstitutional, it must be followed until vacated or modified. As a general rule, a party may not violate an order and raise the issue of its unconstitutionality collaterally as a defense in the criminal contempt proceeding. Rather, the appropriate method to challenge a court order is to petition to have the order vacated or amended.
 
 
 10
 In Walker v. City of Birmingham,[18] the Supreme Court upheld contempt citations against Dr. Martin Luther King, Jr. and other civil rights protestors enjoined from parading without a permit. The protestors argued that the order and the ordinance upon which it was based were unconstitutional because they constituted impermissible prior restraints upon the right to free speech and assembly. The Court noted that the ordinance "unquestionably raise[d] substantial constitutional issues"[19] and that "[t]he breadth and vagueness of the injunction itself would also unquestionably be subject to substantial constitutional question".[20] Nonetheless, the Court ruled that the protestors could not raise those constitutional issues collaterally in the contempt proceedings. As the Supreme Court noted in United States v. United Mine Workers,[21] so long as the court has jurisdiction over the parties and the subject matter of the controversy, an order it issues must be obeyed.[22]
 
 
 11
 The Walker Court found it significant that the contemnors had not sought to appeal the order they violated. The Court declared: "This case would arise in quite a different constitutional posture if the petitioners, before disobeying the injunction, had challenged it in the Alabama courts, and had been met with delay or frustration of their constitutional claims."[23] The Walker Court concluded by noting that "no man can be judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion".[24]
 
 
 12
 At first glance, Walker would appear to control the instant case. There, as here, a party chose to violate an arguably unconstitutional prior restraint rather than to comply with the orderly process of law by seeking relief from an appellate court. Walker declares that the contemnors are collaterally barred from challenging the constitutionality of the order forming the basis of the contempt citation. The Walker Court was, however, careful to point out that the order issued by the Alabama court was not "transparently invalid". The Court specifically noted that "this is not a case where the injunction was transparently invalid or had only a frivolous pretense to validity".[25] The unmistakable import of this language is that a transparently invalid order cannot form the basis for a contempt citation.[26]
 
 
 13
 Court orders are accorded a special status in American jurisprudence. While one may violate a statute and raise as a defense the statute's unconstitutionality, such is not generally the case with a court order.[27] Nonetheless, court orders are not sacrosanct.[28] An order entered by a court clearly without jurisdiction over the contemnors or the subject matter is not protected by the collateral bar rule.[29] Were this not the case, a court could wield power over parties or matters obviously not within its authority--a concept inconsistent with the notion that the judiciary may exercise only those powers entrusted to it by law.
 
 
 14
 The same principle supports an exception to the collateral bar rule for transparently invalid court orders. Requiring a party subject to such an order to obey or face contempt would give the courts powers far in excess of any authorized by the Constitution or Congress. Recognizing an exception to the collateral bar rule for transparently invalid orders does not violate the principle that "no man can be judge in his own case"[30] anymore than does recognizing such an exception for jurisdictional defects. The key to both exceptions is the notion that although a court order--even an arguably incorrect court order--demands respect, so does the right of the citizen to be free of clearly improper exercises of judicial authority.
 
 
 15
 Although an exception to the collateral bar rule is appropriate for transparently void orders, it is inappropriate for arguably proper orders. This distinction is necessary both to protect the authority of the courts when they address close questions and to create a strong incentive for parties to follow the orderly process of law. No such protection or incentive is needed when the order is transparently invalid because in that instance the court is acting so far in excess of its authority that it has no right to expect compliance and no interest is protected by requiring compliance.
 
 
 16
 The line between a transparently invalid order and one that is merely invalid is, of course, not always distinct. As a general rule, if the court reviewing the order finds the order to have had any pretence to validity at the time it was issued, the reviewing court should enforce the collateral bar rule. Such a heavy presumption in favor of validity is necessary to protect the rightful power of the courts. Nonetheless, there are instances where an order will be so patently unconstitutional that it will be excepted from the collateral bar rule.[31] We now turn to consider whether the order issued by the district court on November 13, 1985, was, as the Journal contends, transparently invalid.
 
 
 17
 As noted, the principal purpose of the First Amendment's guaranty is to prevent prior restraints.[32] The Supreme Court has declared: "Any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity."[33] When, as here, the prior restraint impinges upon the right of the press to communicate news and involves expression in the form of pure speech--speech not connected with any conduct--the presumption of unconstitutionality is virtually insurmountable.[34]
 
 
 18
 The distinction between pure speech and speech involving conduct clearly distinguishes the order at issue in Walker from the order at issue in the instant case.[35] Immediately after the Walker Court stated that the order of the Alabama court was not transparently invalid, it noted:
 
 
 19
 We have consistently recognized the strong interest of state and local governments in regulating the use of their streets and other public places. When protest takes the form of mass demonstrations, parades, or picketing on public streets and sidewalks, the free passage of traffic and the prevention of public disorder and violence become important objects of legitimate state concern. As the Court stated in Cox v. Louisiana, "We emphatically reject the notion ... that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as those amendments afford to those who communicate ideas by pure speech."[36]
 
 
 20
 The clear import of this language is that a different result, or at a minimum a different analysis, would have been required had the Walker order restrained pure speech.[37]
 
 
 21
 In its nearly two centuries of existence, the Supreme Court has never upheld a prior restraint on pure speech. In New York Times Co. v. United States,[38] the Pentagon Papers case, the Court held that the New York Times and other newspapers could not be restrained even during wartime from publishing documents that had been classified top secret and obtained without authorization. Notwithstanding that the source who had provided the documents had obtained them possibly as a result of criminal conduct and notwithstanding the government's contention that publication would gravely and irreparably jeopardize national security, the Court refused to uphold the restraint. In his concurring opinion, Justice Stewart stated that a prior restraint upon publication was improper absent proof that publication "will surely result in direct, immediate, and irreparable damage to our Nation or its people".[39]
 
 
 22
 In its most recent decision on previous restraints on pure speech, Nebraska Press Association v. Stuart,[40] the Court struck down a gag order issued to ensure the protection of a criminal defendant's Sixth Amendment right to a fair trial. Intending to keep "the barriers to prior restraint ... high unless we are to abandon what the Court has said for nearly a quarter of our national existence and implied throughout all of it",[41] the Court established a test so difficult to meet that Justice White was led to express his "grave doubt" that any prior restraint in the area would "ever be justifiable".[42] The test requires proof to be established "with the degree of certainty our cases on prior restraint require",[43] that (1) the nature and extent of pretrial publicity would impair the defendant's right to a fair trial; (2) there were no alternative measures which could mitigate the effects of the publicity; and (3) a prior restraint would effectively prevent the harm.[44] It is patently clear that the order of November 13, 1985, fails to pass muster under the Nebraska Press Association test.
 
 
 23
 Patriarca's request for injunctive relief was based on three grounds: the FOIA, Title III, and the Fourth Amendment. A brief review reveals that none of these three could conceivably support the restraint against publication.
 
 
 24
 In 1979, this Court upheld the FBI's refusal to comply with an FOIA request by the Journal for the Patriarca logs and memoranda.[45] We did not rule that the FBI was forbidden from disclosing those materials; rather, we held that the FBI could, in its discretion, turn down the request.[46] Indeed, in Chrysler Corp. v. Brown,[47] the Supreme Court made clear that the FOIA does not authorize an injunction against disclosure.[48] If the FOIA does not allow a court to prevent a federal agency from disclosing information to the public, it is beyond dispute that it cannot serve as the basis for an order prohibiting a newspaper that has received such information from publishing it. Even if the materials had been given to the Journal improperly or unlawfully, a prior restraint against publication would still be improper.[49]
 
 
 25
 Similarly, Title III provides no basis for a prior restraint. Title III provides an action for damages to individuals injured as a result of illegal interception or disclosure of private communications.[50] Title III does not, however, provide for injunctive relief, although Congress could have included such a provision.[51] Moreover, the Patriarca electronic surveillance was conducted between 1962 and 1965; Title III was not enacted until 1968. Although we need not decide the issue, we note that the District of Columbia Circuit Court of Appeals has ruled that Title III does not apply retroactively to illegal surveillance conducted before its enactment.[52] Thus, even if injunctive relief were available under Title III, such relief would not necessarily be available in this case.
 
 
 26
 The final basis for injunctive relief asserted by Partriarca was the Fourth Amendment. A review of the district court's opinion finding the Journal in contempt reveals that the Fourth Amendment issue was utmost on its mind when it entered the November 13, 1985 order. As private parties, however, the Journal and its executive editor cannot violate the Fourth Amendment. The Fourth Amendment protects citizens from abuses by the government,[53] not from actions of private parties.[54] Absent a claim that a newspaper and the FBI were somehow conspiring to violate an individual's rights, the Fourth Amendment simply cannot be the predicate of a prior restraint. The Journal obtained the logs and memoranda as a result of a proper FOIA request. Although a Fourth Amendment violation might have occurred when the FBI conducted the surveillance, or possibly when it turned the information over to the media, no Fourth Amendment issues are implicated by the publication of that information by the Journal.[55]
 
 
 27
 The only interest implicated by the Journal's publication is Patriarca's right to privacy. That publication would prove embarrassing or infringe Patriarca's privacy rights is, however, an insufficient basis for issuing a prior restraint.[56] Rather, Patriarca's sole remedy was a subsequent action for damages,[57] an alternative that he did not pursue.
 
 
 28
 Although the Supreme Court has never upheld a prior restraint on publication of news,[58] the Court has implied that such a restraint might be appropriate in a very narrow range of cases, when either national security or an individual's right to a fair trial is at stake. An individual's right to protect his privacy from damage by private parties, although meriting great protection, is simply not of the same magnitude. But, even assuming that Patriarca's right to privacy, or any other right he could assert, had measured up to the standard necessary for a court to deprive the press of its right to publish, and assuming that Patriarca had sufficiently proved that publication would "surely result in direct, immediate, and irreparable damage"[59] to his rights, the November 13, 1985, order suffered from other infirmities.
 
 
 29
 As the Supreme Court made clear in Nebraska Press Association, a party seeking a prior restraint against the press must show not only that publication will result in damage to a near sacred right, but also that the prior restraint will be effective and that no less extreme measures are available.[60] The district court failed to make a finding as to either of these issues, an omission making the invalidity of the order even more transparent. Indeed, had the court considered the likely efficacy of the order it would have concluded that the order would not necessarily protect Patriarca's rights. Other media, included non-parties to the Patriarca litigation, had the same information that the government had disclosed to the Journal. Moreover, Patriarca's complaint specifically alleged that portions of the information disclosed by the FBI had already been "disseminated" by the media. It is therefore hard to imagine a finding that the prior restraint would accomplish its purpose.
 
 
 30
 An additional point to note is that the prior restraint was issued prior to a full and fair hearing with all the attendant procedural protections. A prior restraint issued in these circumstances faces an even heavier presumption of invalidity,[61] and the transparent unconstitutionality of the order is made even more patent by the absence of such a hearing.[62]
 
 
 31
 The special prosecutor argues, however, that the order was to last only a short period and merely preserved the status quo while allowing the court a full opportunity to assess the issues. We are sympathetic with the district court on this score. This matter came before the district court on an emergency basis. The court was forced to drop its other duties and immediately address this issue. Counsel for the Journal had received the papers less than 24 hours before they presented their arguments to the district court. Based on counsel's hastily prepared authority and without the opportunity for cool reflection, the district court was forced to make a decision. The court's natural instinct was to delay the matter temporarily so that a careful, thoughtful answer could be crafted. This approach is proper in most instances, and indeed to follow any other course of action would often be irresponsible. But, absent the most compelling circumstances, when that approach results in a prior restraint on pure speech by the press it is not allowed.
 
 
 32
 It must be said, it is misleading in the context of daily newspaper publishing to argue that a temporary restraining order merely preserves the status quo. The status quo of daily newspapers is to publish news promptly that editors decide to publish. A restraining order disturbs the status quo and impinges on the exercise of editorial discretion. News is a constantly changing and dynamic quantity. Today's news will often be tomorrow's history.[63] This is especially true in the case of news concerning an imminent event such as an election. A restraining order lasting only hours can effectively prevent publication of news that will have an impact on that event and on those that the event affects.
 
 
 33
 Although there is no question that the Patriarca story was not news concerning an imminent event, extraneous factors required its reasonably prompt publication.[64] The Journal had promised its readers that the Patriarca story would be forthcoming. Moreover, other media not subject to the court order had the same logs and memoranda. Were they to disseminate this information while the Journal remained silent, some readers of the Journal might lose confidence in that paper's editorial competence.[65]
 
 
 34
 As the Supreme Court recognized in Elrod v. Burns,[66] "[t]he loss of First Amendment Freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury".[67] The heavy presumption of unconstitutionality against a prior restraint "is not reduced by the temporary nature of [the] restraint".[68] In the Pentagon Papers case, Justice Brennan noted in his concurrence that "every restraint in this case, whatever its form, has violated the First Amendment--and not less so because that restraint was justified as necessary to afford the courts an opportunity to examine the claim more thoroughly".[69]
 
 
 35
 Although the Journal arguably had avenues of appellate relief immediately available to it,[70] we decline to invoke the collateral bar rule because of the Journal's failure to avail itself of these opportunities.[71] When, as here, the court order is a transparently invalid prior restraint on pure speech, the delay and expense of an appeal is unnecessary. Indeed, the delay caused by an appellate review requirement could, in the case of a prior restraint involving news concerning an imminent event, cause the restrained information to lose its value. The absence of such a requirement will not, however, lead to wide-spread disregard of court orders. Rarely will a party be subject to a transparently invalid court order. Prior restraints on pure speech represent an unusual class of orders because they are presumptively unconstitutional.[72] And even when a party believes it is subject to a transparently invalid order, seeking review in an appellate court is a far safer means of testing the order. For if the party chooses to violate the order and the order turns out not to be transparently invalid, the party must suffer the consequences of a contempt citation.
 
 CONCLUSION
 
 36
 We conclude that the district court's order of November 13, 1985, was transparently invalid. The order constituted a presumptively unconstitutional prior restraint on pure speech by the press. The burden necessary to sustain such an order is tremendously heavy[73] and was not met in this case. The only potential danger posed by the restrained speech was to an individual's privacy right. That right can be adequately protected by a subsequent damages action. Moreover, the district court failed to find with certainty that the restraint would accomplish its goal and that no less restrictive alternatives were available. Indeed, it is clear that the court could not have found that the order would necessarily be effective.
 
 
 37
 Because the order was transparently invalid, the appellants should have been allowed to challenge its constitutionality at the contempt proceedings.[74] A fortiori, the order cannot serve as the basis for a contempt citation. The order of the district court finding the Providence Journal Company and its executive editor, Charles M. Hauser, in criminal contempt is therefore reversed.[75]
 
 
 
 *
 Of the Fifth Circuit, sitting by designation
 
 
 [1]
 5 U.S.C. Sec. 552
 
 
 [2]
 5 U.S.C. Sec. 552(b)(7)(C)
 
 
 [3]
 Providence Journal Co. v. F.B.I., 460 F.Supp. 762 (D.R.I.1978)
 
 
 [4]
 Providence Journal Co. v. F.B.I., 602 F.2d 1010 (1st Cir.1979), cert. denied, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 752 (1980)
 
 
 [5]
 Patriarca also named other federal agencies as defendants. Those parties are not relevant for purposes of this appeal
 
 
 [6]
 Several of the illegally intercepted conversations were between Raymond J. Patriarca and Raymond L.S. Patriarca
 
 
 [7]
 5 U.S.C. Sec. 552
 
 
 [8]
 18 U.S.C. Secs. 2510-2520
 
 
 [9]
 See Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967); United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947)
 
 
 [10]
 Nebraska Press Assoc. v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)
 
 
 [11]
 Near, 283 U.S. at 713, 51 S.Ct. at 630
 
 
 [12]
 Nebraska Press Assoc., 427 U.S. at 559, 96 S.Ct. at 2802
 
 
 [13]
 Near, 283 U.S. at 720, 51 S.Ct. at 652
 
 
 [14]
 Nebraska Press Assoc., 427 U.S. at 559, 96 S.Ct. at 2802 ("If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time.")
 
 
 [15]
 In re Halkin, 598 F.2d 176, 185 n. 17 (D.C.Cir.1979)
 
 
 [16]
 Id. at 184 n. 15, citing Emerson, The Doctrine of Prior Restraint, 20 Law & Contemp. Probs. 648, 657-58 (1955)
 
 
 [17]
 Walker, 388 U.S. 307, 87 S.Ct. 1824; United Mine Workers, 330 U.S. 258, 67 S.Ct. 677
 
 
 [18]
 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967)
 
 
 [19]
 388 U.S. at 316, 87 S.Ct. at 1829
 
 
 [20]
 Id. at 317, 87 S.Ct. at 1830
 
 
 [21]
 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947)
 
 
 [22]
 Id. at 293, 67 S.Ct. at 695 ("[A]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings.")
 
 
 [23]
 388 U.S. at 318, 87 S.Ct. at 1830
 
 
 [24]
 Id. at 320-21, 87 S.Ct. at 1831-32
 
 
 [25]
 Id. at 315, 87 S.Ct. at 1829 (emphasis added)
 
 
 [26]
 See 3 Wright, Federal Practice & Procedure Sec. 702 at 815 n. 17 (1982) (collateral bar rule does not apply if the order violated was transparently unconstitutional); State ex rel. Superior Ct. of Snohomish County v. Sperry, 79 Wash.2d 69, 483 P.2d 608 (1971), cert. denied, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (contempt citation improper because order violated was transparently void); see also United States v. Dickinson, 465 F.2d 496, 509-10 (5th Cir.1972) (recognizing exception to collateral bar rule for transparently invalid orders); Ex parte Purvis, 382 So.2d 512, 514 (Ala.1980) (same)
 
 
 [27]
 Compare Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1968) with Walker, 388 U.S. 307, 87 S.Ct. 1824; see also Dickinson, 465 F.2d at 510
 
 
 [28]
 See Cobbledick v. United States, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940); accord United States v. Ryan, 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971). In Cobbledick, the Supreme Court ruled that when a motion to quash a subpoena is denied, the movant may either obey its commands or violate them, and, if cited for contempt, properly contest its validity in the contempt proceeding. Cf. Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); Maness v. Meyers, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975)
 Although these cases are arguably distinguishable from the instant case because they involve orders that require the surrender of irretrievable rights, they nonetheless establish that blind obedience to all court orders is not required. See also Nebraska Press Assoc., 427 U.S. at 559, 96 S.Ct. at 2802 ("A prior restraint ... has an immediate and irreversible sanction.")
 
 
 [29]
 United Mine Workers, 330 U.S. at 293, 67 S.Ct. at 695
 
 
 [30]
 Walker, 388 U.S. at 320-21, 87 S.Ct. at 1831-32
 
 
 [31]
 We pause to note that the existence of a transparently unconstitutional order does not indicate an improper motive or incompetence. To the contrary, any number of factors including a short deadline, an excessive workload on the court, or the poor presentation of the issues by the parties can lead the court to issue an order that would not have been issued in the absence of the exigent circumstances
 
 
 [32]
 Near, 283 U.S. at 713, 51 S.Ct. at 630
 
 
 [33]
 Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971); see also Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963)
 
 
 [34]
 Nebraska Press Assoc., 427 U.S. at 558, 570, 96 S.Ct. at 2802, 2808 (White, J., concurring)
 
 
 [35]
 The four dissenters in Walker found the ordinance invalid on its face and that the restatement of its provisions by the court in an order was not enough to justify the prior restraint. 388 U.S. 328, 345-46, 87 S.Ct. 1836, 1845
 
 
 [36]
 Walker, 388 U.S. at 315-16, 87 S.Ct. at 1829 (citations omitted)
 
 
 [37]
 See, e.g., Cooper v. Rockford Newspapers, Inc., 50 Ill.App.3d 250, 8 Ill.Dec. 508, 365 N.E.2d 746, 751 (1977) (distinguishing Walker on these grounds)
 
 
 [38]
 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)
 
 
 [39]
 Id. at 730, 91 S.Ct. at 2149 (Stewart, J., concurring); see also id. at 726-27, 91 S.Ct. at 2147-48 (Brennan, J., concurring) ("Thus, only governmental allegation and proof that publication must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea can support even the issuance of an interim restraining order.")
 
 
 [40]
 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976)
 
 
 [41]
 Id. at 561, 96 S.Ct. at 2803
 
 
 [42]
 Id. at 570, 96 S.Ct. at 2808 (White, J., concurring); see also Goodale, The Press Ungagged: The Practical Effect on Gag Order Litigation of Nebraska Press Association v. Stuart, 29 Stan.L.Rev. 497, 497-98 (1977) ("[T]he practical impact of the rule announced [in Nebraska Press Association v. Stuart ] is to outlaw all prior restraints in fair trial/free press cases.")
 
 
 [43]
 427 U.S. at 569, 96 S.Ct. at 2807
 
 
 [44]
 Id. at 562-68, 96 S.Ct. at 2804-07
 
 
 [45]
 Providence Journal Co., 602 F.2d 1010
 
 
 [46]
 Id. at 1014-15 ("Our holding is not broad. It gives agencies no sweeping power to withhold information, and does not create a new, general exemption for illegally obtained information.... We decide only that the FBI may properly turn down this FOIA request under Exemption 7(C).") (footnote omitted)
 
 
 [47]
 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)
 
 
 [48]
 Id. at 293, 99 S.Ct. at 1713
 
 
 [49]
 See New York Times Co., 403 U.S. 713, 91 S.Ct. 2140
 
 
 [50]
 18 U.S.C. Sec. 2520
 
 
 [51]
 Even if Congress had authorized the issuance of a prior restraint under either the FOIA or Title III, a court could issue such an order only if the restraint met the standards articulated by the Supreme Court. Obviously, Congress cannot abrogate by statute the protection accorded the press under the First Amendment
 
 
 [52]
 Zerilli v. Evening News Assoc., 628 F.2d 217, 220-21 (D.C.Cir.1980)
 
 
 [53]
 United States v. Calandra, 414 U.S. 338, 354, 94 S.Ct. 613, 622, 38 L.Ed.2d 561 (1974) ("The purpose of the Fourth Amendment is to prevent unreasonable governmental intrusions into the privacy of one's person, house, papers, or effects.") (emphasis added); Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921)
 
 
 [54]
 Burdeau, 256 U.S. at 475, 41 S.Ct. at 576; Zerilli, 628 F.2d at 223-24
 
 
 [55]
 Even if the Journal were subject to the Fourth Amendment, it is doubtful that Patriarca's Fourth Amendment rights could justify a prior restraint. In Southeastern Promotions Ltd. v. Conrad, 420 U.S. 546, 559, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975), the Supreme Court declared that a prior restraint is unlawful unless it "fit[s] within one of the narrowly defined exceptions to the prohibition against prior restraints". The special prosecutor has not cited and we have not found any case upholding a prior restraint issued to protect Fourth Amendment rights. Cf. Nebraska Press Assoc., 427 U.S. 539, 96 S.Ct. 2791 (possible exception to prohibition against prior restraints for orders protecting a defendant's right to a fair trial); New York Times Co., 403 U.S. 713, 91 S.Ct. 2140 (same for orders protecting national security)
 
 
 [56]
 Organization for a Better Austin, 402 U.S. at 419, 91 S.Ct. at 1577; Bergelsman, Injunctions Against Speech and Writing: A Re-Evaluation, 59 Ky.L.J. 319, 349-50 (1970); cf. Konigsberg v. Time, Inc., 288 F.Supp. 989, 989 (S.D.N.Y.1968)
 
 
 [57]
 See Near, 283 U.S. at 720, 51 S.Ct. at 632
 
 
 [58]
 Cf. New York Times Co., 403 U.S. at 726 n * 91 S.Ct. at 2147 n * (Brennan, J., concurring) (Noting that orders prohibiting publication of materials that are obscene or violate copyright provisions are not prior restraints on the freedoms of speech and press protected under the First Amendment)
 
 
 [59]
 Id. at 730, 91 S.Ct. at 2149 (Stewart, J., concurring)
 
 
 [60]
 427 U.S. at 562-68, 96 S.Ct. at 2804-07
 
 
 [61]
 See generally Redish, The Proper Role of the Prior Restraint Doctrine in First Amendment Theory, 70 Va.L.Rev. 53 (1984)
 
 
 [62]
 We realize that holding a full hearing on short notice could greatly burden a district court. But, absent circumstances not present in this case, the First Amendment demands nothing less. If the parties agree, the district court can hold the hearing on a less expedited basis. Whether the newspaper could renege on this agreement and demand an immediate hearing is a question we need not address
 The special prosecutor argues that the Journal did agree to abide by the order to allow the district court time to consider the matter when it asked the court to continue for one day the hearing set to determine whether the temporary restraining order should be vacated. No doubt the district court could reasonably assume, based on the request for a day's delay, that a responsible newspaper, represented by respected counsel, would not take advantage of the delay by publishing the Patriarca story before the hearing. It is clear from the record, however, that the Journal did not agree to obey the district court's order.
 
 
 [63]
 Dickinson, 465 F.2d at 512
 
 
 [64]
 We need not decide whether our ruling would be different if it were absolutely clear that publication could be delayed without any untoward consequences to the publisher. We point out, however, that even in such a situation, a prior restraint would unquestionably impinge upon First Amendment rights and editorial discretion
 
 
 [65]
 In United States v. Dickinson, 465 F.2d 496 (5th Cir.1982), the Court of Appeals for the Fifth Circuit applied the collateral bar rule in a contempt proceeding involving a gag order against a newspaper. We decline to follow Dickinson for two reasons. First, Dickinson involved an order issued to protect a defendant's Sixth Amendment right to a fair trial, while the order in the instant matter was issued merely to protect an individual's interest in privacy. Second, Dickinson was decided before Nebraska Press Association. Were the question presented to the Fifth Circuit now, in the light of the strict test established in Nebraska Press Association, a different result might be reached
 
 
 [66]
 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)
 
 
 [67]
 Id. at 373, 96 S.Ct. at 2689
 
 
 [68]
 Nebraska Press Assoc., 427 U.S. at 559, 96 S.Ct. at 2802
 
 
 [69]
 New York Times Co., 403 U.S. at 727, 91 S.Ct. at 2148 (Brennan, J., concurring); see also Goldblum v. National Broadcasting Corp., 584 F.2d 904, 906-07 (9th Cir.1978)
 
 
 [70]
 Arguably, the Journal could have immediately appealed the order to this Court under 28 U.S.C. Sec. 1292(a)(1). See Societe Generale de Surveillance v. Raytheon European Management and Systems Co., 643 F.2d 863, 864 n. 2 (1st Cir.1981). And, although difficult to obtain, the Journal might have sought a writ of mandamus. 28 U.S.C. Sec. 1651(a)
 
 
 [71]
 If the publisher must appeal, it "faces a dilemma: either violate the order, risking almost certain conviction for contempt, and lose the right to challenge the order's constitutionality, or alternatively, obey the order, seek review, and forfeit, at least temporarily, the very right the would-be speaker seeks to vindicate. The dilemma is particularly acute where First Amendment interests are at stake, for even a temporary restraint on expression may constitute irreparable injury. Nebraska Press Ass'n, 427 U.S. at 559, 96 S.Ct. 2791 [at 2802], Carroll v. President and Commissioners of Princess Anne, 393 U.S. 175, 182, 89 S.Ct. 347 [352, 21 L.Ed.2d 325] (1968)." In re Halkin, 598 F.2d at 184 n. 15; see also Goldblum, 584 F.2d at 907. ("A broadcaster or publisher should not, in circumstances such as those in this case, be required to make a sudden appearance in court and then to take urgent measures to secure appellate relief, all the while weighing the delicate question of whether or not refusal to comply with an apparently invalid order constitutes a contempt."); Goodale, 29 Stan.L.Rev. at 509 (Walker does not require a party subject to a transparently invalid prior restraint to seek appellate review.)
 
 
 [72]
 Nebraska Press Assoc., 427 U.S. at 558, 96 S.Ct. at 2802
 
 
 [73]
 Southeastern Promotions Ltd., 420 U.S. at 558, 95 S.Ct. at 1246; New York Times Co., 403 U.S. at 714, 91 S.Ct. at 2141; Organization for a Better Austin, 402 U.S. at 419, 91 S.Ct. at 1577
 
 
 [74]
 See State ex rel. Superior Court of Snohomish County, 79 Wash.2d 69, 483 P.2d 608; Phoenix Newspapers, Inc. v. Superior Court, 101 Ariz. 257, 418 P.2d 594 (1966); Wood v. Goodson, 253 Ark. 196, 485 S.W.2d 213 (1972); Cooper, 50 Ill.App.3d 250, 8 Ill.Dec. 508, 365 N.E.2d 746 (1977); Barnett, The Puzzle of Prior Restraint, 29 Stan.L.Rev. 539, 553-58 (1977); Goodale, 29 Stan.L.Rev. at 509; see also Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945)
 In Thomas, a labor organization was enjoined from soliciting union memberships. The organizer violated the order and subsequently challenged its constitutionality arguing that the temporary restraining order constituted a prior restraint on pure speech. The Supreme Court allowed this challenge and reversed the contempt citation.
 The Journal argues that Thomas stands for the proposition that the collateral bar rule does not apply to prior restraints on pure speech. Because the order of November 13, 1985, was transparently invalid, however, we need not address this issue. We note, however, that Thomas does provide support for our holding. Thomas held that any prior restraint on pure speech was invalid absent clear and present danger of immediate and irreparable injury to the public welfare. Moreover, Thomas establishes that the collateral bar rule is not impregnable in cases involving prior restraints on pure speech.
 
 
 [75]
 In reversing the contempt citation against the Journal and its executive editor, we in no way condone their conduct. From all appearances, the Journal used the presence of the court order to bolster the importance of the Patriarca story. On November 14, 1985, the day before the scheduled hearing on whether to vacate the Court order of November 13, the Journal's front page headline read: "Court restricts media use of FBI tapes on Patriarca; Journal decides to print". Upon learning of this "battle with the courts", readers would be curious as to what information about Patriarca could be so important that a federal court would prohibit its publication. Not only would more people read the story, but hopefully, those who read the story would respect the Journal's courage in defying the court order and would have a greater appreciation for the Journal's investigative reporting techniques that resulted in the uncovering of the information in the story
 By publishing the Patriarca story the day before the scheduled hearing and by not seeking expedited appellate review of the court's order, the Journal invited a confrontation. We strongly encourage a party subject to a court order to follow the orderly process of law and appeal the order, even if it is transparently invalid, as we have written. But we do not believe that the Journal violated the law when it defied the order of November 13, 1985. Nor do we believe the Journal should have refrained from informing its readers that a court order prohibiting publication had been entered. But it appears to this court that the Journal published the story concerning the court order more for its publicity value than for its news value. Moreover, while professing respect for the judge who entered the order, the Journal chose to make its defiance of that order its headline story.
 Misuse of the power of the press cannot be curbed constitutionally by prior restraints in the absence of the most compelling of circumstances, at least where national security is not involved. Although the Journal's actions are not in keeping with its long and distinguished history of responsible journalism they cannot form the basis for a contempt citation.